1
2
3
4
5
6
7
8            IN THE UNITED STATES DISTRICT COURT FOR THE

9                    EASTERN DISTRICT OF CALIFORNIA

10
11  KEVIN MICHAEL SMITH,                    2:06-cv-01762-RCT

12            Petitioner,

13        vs.

14  RICHARD KIRKLAND, et al.,

15            Respondents.

16  _____/        MEMORANDUM DECISION
                                            AND ORDER

17
18        This matter comes before the Court on Kevin Michael Smith's petition for a writ of

19  habeas corpus pursuant to 28 U.S.C. § 2254.

20                                  INTRODUCTION

21        Petitioner Smith is a state prisoner currently incarcerated at the Pelican Bay State Prison

22  in Crescent City, California.  He filed this petition for a writ of habeas corpus to challenge a

23  judgment of conviction entered against him in the Sacramento County Superior Court in 2004

24  for first degree murder by means of lying in wait, with a firearm enhancement.  A review of the

25  record shows that the Superior Court and the California Court of Appeal, Third Appellate

26  District, correctly applied United States Supreme Court law in rejecting all three claims

27  presented in the petition.  28 U.S.C. § 2254(d).  Accordingly, the petition is denied, and the case

28  is dismissed with prejudice.

PROCEDURAL AND FACTUAL HISTORY

The Sacramento County Superior Court convictions resulted in a sentence of life imprisonment without the possibility of parole to be served consecutively to a sentence of 25 years to life.

The California Court of Appeal summarized the facts of this case as follows:

LaTrenda Mangram disappeared on May 2, 2003.  Officers arrested defendant, who was charged with murder committed by means of kidnapping and lying in wait.

Defendant twice moved to suppress his confession as involuntary under *Miranda*.  Defendant also moved to dismiss the lying in wait special circumstance allegation.  The trial court denied the motions.  A jury trial followed.

At trial, Mangram's best friend, Karen Bierria, testified that sometime in 1999 or 2000 Mangram told her she was involved with defendant.  Mangram feared for her safety and told Bierria she wanted her to know where defendant lived in case something happened to her.  Mangram relocated three times to try to get away from defendant.  Ultimately, Mangram moved to a women's shelter because she feared defendant might harm anyone who gave her refuge.

On May 1, 2003, Mangram called Wendy Alvey, an auto parts vendor.  Alvey testified Mangram told her she no longer worked at defendant's business and wanted to purchase a starter for her car.  That evening, Mangram arrived at Alvey's home to pick up the part.  Upset and crying, Mangram told Alvey that she and defendant had been involved in a sexual relationship.  Defendant wanted Mangram to move in with him and his wife.  However, defendant told Mangram her children were not welcome.  Mangram told Alvey she turned down the proposition and moved to a shelter to avoid defendant.

The following evening, Mangram telephoned her sister-in-law, Kristie McLean.  McLean testified Mangram sounded depressed and tearful as she told McLean she wanted to end her relationship with defendant.  The next day, McLean and her husband went to defendant's auto shop to confront defendant about whether he knew where Mangram was.  Defendant claimed to know nothing of her whereabouts and said he loved Mangram more than anything in the world.  Defendant told the McLeans they would need to apologize to him when they found Mangram.

Ronnie McLean, Mangram's 16-year-old son, testified about the night of his mother's disappearance.  Mangram and her five children had been living in a shelter for a few weeks.  That night, Mangram and her children picked up some food at a fast food restaurant and drove back to the shelter.  Mangram passed the shelter and parked down the street.  She got out of the car and spoke angrily with someone on her cellular telephone.  Mangram got back in the car and drove to the shelter's parking lot.  She left her children in the car, telling them she was going to retrieve their room key from the shelter office.  She never returned.

After waiting about a half hour, the children entered their room at the shelter and found their mother's purse on the floor.  Ronnie attempted to call Mangram's cellular telephone but failed to reach her.  Mangram later called Ronnie from her cellular telephone and told him she had gone around the corner for a cigarette.  Ronnie asked if his mother was coming home and she replied that she "had to go."  Despite repeated attempts to reach his mother, Ronnie never spoke to Mangram again.

Barbara Cavanagh, a manager at the shelter, testified she saw Mangram at around 10:00 p.m. on the evening of her disappearance.  The shelter had a 10:00

p.m. curfew.  Mangram stood next to a sport utility vehicle, possibly a Toyota RAV4.[1]  Mangram spoke with the driver and smiled when she saw Cavanagh. Mangram indicated to Cavanagh she would ask the driver to leave because she knew visitors were not allowed.  Ten minutes later the car and Mangram were gone.

Deputy Sheriff Steve Lickiss testified he went to defendant's auto shop on May 5, 2003.  Defendant contacted police about threats from Mangram's family, who blamed him for her disappearance.  Later that day, defendant told Lickiss he had met Mangram four years earlier and had hired her a year before as his secretary.  Defendant stated he, Mangram, and his wife were all involved in a sexual relationship.

Defendant told Lickiss he had last seen Mangram at the shelter on May 2 at around 10:15 p.m.  Defendant sought Mangram's advice because his wife was upset about his affair with his new secretary, Mangram's replacement.  Defendant said he had set Mangram up with a place to live and a car.  According to defendant, Mangram was unhappy that he and his new secretary were engaged in a sexual relationship.

Defendant spoke with Mangram in his car for about nine minutes outside the shelter.  Mangram then got out of his car, lit a cigarette, and walked toward the shelter.

Defendant left and met his wife at the auto shop.  Defendant's father-in-law came to the shop around 11:15 p.m. to repair faulty car lights. Defendant and his wife left the shop around 2:00 a.m.  He was unable to reach Mangram by phone after that evening.

On May 6, 2003, the day after Lickiss spoke with defendant, Detective Ron Garverick interviewed defendant.  During the interview, defendant referred to pages in a binder, which was later recovered during a search of his home.  The pages detailed defendant's version of the events the night of Mangram's disappearance.

Sheriff's Sergeant Craig Hill interviewed defendant on May 7, 2003.  Hill testified he and Detective Grant Stomsvik interviewed defendant at a sheriff's service center, a convenient location for defendant.  During the interview, other officers were obtaining search warrants for defendant's home and work, as well as statements from others involved in the case.  Hill told defendant of the ongoing investigation.

Hill, who was overseeing the investigation, thought Mangram might have met with foul play and told defendant he had assigned deputies to talk to those who knew her.  Defendant denied any involvement in Mangram's disappearance. He also denied his wife was involved.  According to defendant, if he had wanted to concoct an alibi, he would not have included his wife because he cared about their children.  Hill told defendant he believed his wife was involved.

Approximately an hour and a half into the interview, defendant was placed under arrest.  Stomsvik began booking defendant, and defendant asked to speak with Hill alone.  Defendant told Hill he wanted a deal for his wife, who was not involved in Mangram's murder.  Defendant said he wanted to die but could not kill himself because he was a Christian.  Defendant wanted Hill to take off his handcuffs so he could go for Hill's gun, and then Hill could shoot him.

Defendant then announced a desire to confess.  Hill contacted the district attorney and suggested they try to arrange a deal for defendant's wife in order to find Mangram's body.

---

[1] Defendant told detectives he drove a customer's car, a Toyota RAV4, to the shelter that evening to meet Mangram.

-3-

         The jury heard defendant's taped confession and audio-taped interviews
with Hill and Stomsvik.  Defendant told the deputies he was depressed on May 2,
2003.  He called his wife that night and asked her to bring him a rifle so he could
shoot Mangram.  His wife brought the rifle, and defendant told her if she did not
see him by 2:00 a.m., he would be dead.
         Defendant intended to shoot Mangram.  He drove to the shelter and waited
for her.  Defendant told Mangram that he needed help with his new secretary.
Mangram got into defendant's car and he drove across the street.
         Defendant then drove Mangram to his auto shop and accused her of lying
to him.  Defendant took the rifle out of his car and Mangram tried to flee.  The
pair "got into a scuffle," and defendant struck Mangram with an automobile part, a
rotor.  Defendant shot Mangram in the head and chest.  He also intended to
commit suicide but changed his mind.  Defendant called a friend, who came and
helped him dispose of Mangram's body in a field.
         Stomsvik testified information from defendant and his friend led them to
Mangram's body.  Mangram had gunshot wounds in the chest and head, either of
which would have been fatal.  Detectives found two empty prescription bottles in
Mangram's name in defendant's home.  A search of defendant's person uncovered
Vicodin and OxyContin.  Defendant told Stomsvik he killed Mangram because of
their failed relationship and "one too many lies."  Defendant never mentioned drug
use in connection with the murder.

(Lodged Doc. 3, at 2-7).

         On May 21, 2003, the district attorney filed a complaint in the Sacramento County

Superior Court charging Smith with premeditated murder (Count I).  The complaint also alleged

two special circumstances, that Smith committed the murder by means of (1) kidnaping and (2)

lying in wait.  Further, the complaint alleged that Smith discharged a firearm causing death.

(Lodged Doc. 1, at 11-12).

         On September 16, 2003, Smith moved to suppress his confession, arguing that it was

involuntary and in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

(Lodged Doc. No.1, at 23).  He also moved to dismiss the lying-in-wait special circumstance

allegation.  (Lodged Doc. No.1, at 14).  An evidentiary hearing followed, at which the

investigating officers testified and the court heard recordings made during the interview of

Smith.  The next day, the trial court denied Smith's motions and bound the defendant over for

trial.  (Lodged Doc. No.1, at 4.)  On November 17, 2003 the trial court granted the

prosecution's motion to dismiss the kidnaping special circumstance allegation.  (Lodged Doc.

No. 1, at 314).  That same day, Smith renewed his motion to suppress his confession pursuant to

*Miranda*.  Specifically, he maintained that the *Miranda* warnings given to him prior to his

confession were defective and that his confession was involuntary because it was obtained after

1    he invoked his right to counsel.  (Lodged Doc. No.1, at 288-310).  On November 18, 2003, the

2    court denied these motions.  (Lodged Doc. No.1, at 426).

3         A jury found Smith guilty of first degree murder with a lying-in-wait special

4    circumstance.  (Lodged Doc. No.1, at 565).  It also found him guilty of the firearm

5    enhancement.  On January 9, 2004, the trial court sentenced Smith to life imprisonment without

6    the possibility of parole on Count I, plus a consecutive term of twenty-five years to life for the

7    discharge-of-a-firearm enhancement.  (Lodged Doc. No.1, at 604-05).  Smith then filed a notice

8    of appeal.  (Lodged Doc. No.1, at 606.)  In an unpublished decision, the California Court of

9    Appeal affirmed the superior court's judgment on May 24, 2005.  (Lodged Doc. No. 3).  Smith

10    thereafter filed a petition for review in the California Supreme Court, which was denied on

11    August 31, 2005, without comment or citation to authority.  (Lodged Doc. No. 5).

12         On August 10, 2006, Smith filed this federal petition for a writ of habeas corpus.

13    Respondents concede that Smith's claims have been fully exhausted, but argue that the California

14    courts' determinations are not contrary to or an unreasonable application of United State

15    Supreme Court precedent.  28 U.S.C. § 2254(d).

16    CLAIMS

17    Smith raises the following claims in his petition:

18    1.  Smith's confession was involuntary because (1) the officers engaged in an
impermissible two-step interrogation process, and (2) the confession was the result of

19    police coercion.

20    2. The trial court erred by providing the jury with pinpoint instructions favorable to the
prosecution, while failing to permit Smith's own modified pinpoint instruction.

21

22    3.  The trial court's instruction on lying in wait omitted an essential element of the crime
and was facially erroneous.

23    LEGAL STANDARD

24    In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

25    ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which established that a

26    federal habeas corpus petition shall not be granted with respect to any claim adjudicated on the

27    merits in the state courts unless the adjudication either: (1) resulted in a decision that was

28    contrary to, or involved an unreasonable application of, clearly established federal law, as

determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. § 2254(d).  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies the principle to the facts of the prisoner's case.  *Id.* at 413.  Furthermore, federal courts are to presume that factual findings made by a state court are correct unless the petitioner rebuts that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct.").

Under AEDPA, the federal courts review the "last reasoned decision" of the state courts.  *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).  Because the California Supreme Court denied Smith's petition for review without comment or citation to authority, the Court will here review the decision of the California Court of Appeal.  The Court has also reviewed the transcripts of the homicide interview, transcripts of the preliminary hearing, and the Sacramento County Superior Court's oral ruling denying the motions to suppress the incriminating confession.

DISCUSSION

## I. Voluntariness of Confession

Smith first claims the trial court erred in denying his motion to suppress his confession.  Smith contends that his confession was given involuntarily, after he had invoked his *Miranda* rights.  He asserts that the police officers employed a two-step interrogation method to coerce his confession, evidenced by delaying his formal arrest and *Miranda* warnings in a deliberate effort to pressure him into a confession.  Further, he claims that he only confessed under duress, after his will was broken by the coercive tactics of interrogating officers.

*A. Smith's Confession*

-6-

The California Court of Appeal determined the following sequence of events surrounding Smith's confession. (Lodged Doc. No. 3, at 13-18). On May 7, 2003, Smith was given a polygraph and advised of his *Miranda* rights by officers investigating Mangram's disappearance. He was then interviewed by detectives, who informed him that he had failed the polygraph. Smith originally denied any involvement in Mangram's disappearance, and said that his intention in speaking with the officers was to clear his name from the list of suspects. Detective Stomsvik informed him that he was not under arrest, but that he had failed a polygraph test given to him. Smith explained that around 10:00 p.m. on the night Mangram disappeared he drove to the shelter where she was staying. After he left, he made a three-way call between Mangram and his secretary. He then called his wife, who was at the auto shop, and agreed to meet her there. They left the shop together around 1:30 a.m.

At this point, Smith told the officers that he needed to leave to put money into a bank account, and that a check of his telephone records would confirm his story. Detective Stomsvik asked if they could speak for another ten minutes, and Smith agreed. Smith again explained that he had left Mangram at the shelter and returned to his auto shop, where he inspected his father-in-law's car. Smith and his wife left the shop together. Smith again asked the officers if he could leave, but stated that he understood the interview was "very important." He noted that he was worried about his shop, but also realized an interview could take two hours.

Though Detective Stomsvik informed Smith that he was free to leave, Sergeant Hill told him that other officers were currently serving search warrants on Smith's home and shop, so heading home would not be convenient. Sergeant Hill also stated that he wanted to make an "extra effort" to talk to Smith, to which Smith replied, "Okay." Sergeant Hill then began to reference discrepancies between Smith's factual recollection and his wife's version of events. Detective Stomsvik told Smith that if he wanted to keep his wife "out of it," Smith needed to tell the police what happened to Mangram. Sergeant Hill told Smith that he knew Smith had something to do with her disappearance.

Smith asked the officers whether he should forget about going back to his shop and paying his bills, though he reiterated his desire to return home. Sergeant Hill informed him that

he could not return home because other officers were currently searching his residence, auto

shop, and had obtained the vehicle he had driven the night of Mangram's disappearance.

Defendant explained that the police would not find anything, because neither he nor his wife had

harmed Mangram.  Sergeant Hill told Smith that his wife was angry and that his story would not

hold up.

Smith asked the officers whether he "[s]hould be calling a lawyer at this point?"  He was

told that he was not under arrest and could leave if he wished, but that he had better tell them

what happened because the truth would eventually come out.  He stated that he would not have

consented to an interview if he had been involved.  When Sergeant Hill asked if he could pose

personal questions to Smith, Smith replied, "Go for it."

Sergeant Hill then asked about Mangram's and Smith's sexual encounters.  He explained

that, while he and Mangram had met at the auto shop around 6:00 p.m. on May 2, he did not

threaten her with a gun.  He told the police about past trips he and Mangram had taken together

and then asked, "for the last time," whether he should seek legal counsel.  Smith acknowledged

that he had not been placed under arrest, and Detective Stomsvik confirmed this as a fact.  When

Smith asked if he could leave to take care of some business, Detective Stomsvik said that he was

free to leave at any time.

Smith began to explain about his wife's high blood pressure, and then asked if he could

use his cellular telephone.  The officers replied that, for officer safety, they would appreciate if

defendant did not make any calls.  Smith replied that "[he] was going to call and try to find

[himself] a lawyer or something."  (Lodged Doc. No. 1, at 734).  He was concerned that officers

were searching his home and business, but he said he felt he had to stay in the interview.

Detective Stomsvik again said that Smith could leave at any time, but that he was trying to

verify Smith's story.  Smith replied that he was not worried about the verification, but noted he

had thought the interview would be short.

The interview then took a turn.  Sergeant Hill stated that he needed to call the district

attorney, and that he would be back in two minutes.  Smith asked Sergeant Hill to contact a

lawyer for him.  Hill returned and said "There is a . . . good chance you might be under arrest at

this point." (Lodged Doc. No.1, at 745).  Smith asked if he could call a lawyer, and the detective responded that he absolutely would be able to contact counsel.  The officers then reviewed Smith's voice-mail messages.  Sergeant Hill told Smith:  "Your status is up in the air.  What do we do with you?  You're the last person to see her alive, okay?  Some inconsistencies in your stories, okay . . . . I want you to sit still for a minute while we try to figure this out.  . . . That acceptable to you?"  Smith replied: "It's going to have to be."  (Lodged Doc. No. 1, at 750).

After requesting and receiving a snack, Smith asked if he could leave.  Detective Stomsvik informed him that he was not free to leave and was being detained.  He then told Smith that he was under arrest.  When asked by the officers if they could swab his cheek for a DNA sample, Smith responded that he wanted to check with a lawyer first.  A search of Smith's person revealed medication.

One hour later, during the booking process, Smith asked to speak with Sergeant Hill.  Other officers stopped Sergeant Hill as he was about to exit the building; he returned and reentered the room where Smith was being held.  Detective Stomsvik confirmed with Smith that, though Smith had previously requested a lawyer, he had changed his mind.  Smith agreed that this was a correct recitation of the events.  He also acknowledged that he was previously read his *Miranda* rights.  Detective Stomsvik then again advised Smith of his constitutional rights, stating:

> So you have the right to remain silent.  Anything you say can and will be used against you in a court of law.  You also have the right to have an attorney present before and during questioning, if you desire.  If you could not afford an attorney, one will be appointed free of charge.  Do you understand all your rights?

(Lodged Doc. No. 1, at 775).

Smith stated that he understood his rights, and after being asked by the officer if he wished to speak with them, he stated that he still wanted to speak with Sergeant Hill.  He then confessed to killing Mangram.  (Lodged Doc. No. 1, at 782-786).

### C. The California Court of Appeal Decision

On direct review, Smith claimed that the trial court erred in admitting his involuntary

confession in violation of his constitutional rights.  He argued that the officers used impermissible means "calculated to break [his] will." (Lodged Doc. No. 3, at 21).  He insisted that the officers misled him regarding his custodial status and that his invocation of the right to counsel were disregarded.  Finally, he argued that his confession was premised on a promise of leniency for his wife.

The California Court of Appeal rejected each claim.  It first noted the rule that all questioning must cease following a defendant's invocation of his rights.  (Lodged Doc. No. 3, at 22).  However, it properly observed that if a "defendant initiates further communication when he or she conveys by words or conduct a desire to engage in a discussion relating directly or indirectly to the investigation[,] . . . officers may interrogate the defendant if he or she validly waives *Miranda* rights."  Furthermore, when a defendant claims that officers coerced his confession, the court observed that it "consider[s] whether the influences brought to bear on the defendant were such as to overbear the defendant's free will to resist and bring about statements not freely determined." (Lodged Doc. No. 3, at 22).  "In determining whether defendant's will was overborne, we examine all the surrounding circumstances."  (Lodged Doc. No. 3, at 22).

The California Court of Appeal found that Smith was free to leave at any time until he was placed under formal arrest.  It noted that while Smith mentioned on multiple occasions that he wanted to return home to pay bills or stop by his business, he always agreed with officers that it was best for him to stay and discuss Mangram's disappearance and his relationship with her.  He believed this was the best way to establish his innocence.  The Court of Appeal concluded that this was "a give and take between defendant and the detectives, . . . [and did] not reveal coercion or an attempt to deprive the defendant of his free will." (Lodged Doc . No. 3, at 24).

Next, the Court of Appeal considered whether Smith's confession was involuntary because it was obtained without a waiver of his *Miranda* rights.  Smith claimed that the officers discouraged him from invoking his right to counsel, and failed to permit him to seek a lawyer's advice after Smith requested it.  The State argued that while Smith pondered whether he should obtain counsel, and even expressed the fact that he planned to call an attorney, he never explicitly invoked his right.  The Court of Appeal said:  "In determining whether or not a defendant's

confession is voluntary, the totality of circumstances must be considered.  On appeal, we independently examine the record, but to the extent the facts conflict, we accept the version favorable to the People if supported by substantial evidence." (Lodged Doc. No. 3, at 25).  It found the facts undisputed.  Smith twice asked whether he should obtain counsel, then later announced an intent to find an attorney, and finally asked to call an attorney.

The Court of Appeal determined that this case was similar to *People v. Clark*, 833 P.2d 561 (Cal. 1992).  There, prior to waiving his right to counsel, the defendant asked how long it would take to get an attorney, told the officers he would like to try to obtain counsel, and that he intended to get an attorney during the process.  *Id.* at 602.  He also said that he wanted to stop the interview to speak with counsel, and want to have counsel join the interrogation as soon as possible, but was "willing to go ahead without him in the interim." *Id.*  The California Supreme Court ruled that this was not a proper invocation of the right to counsel because, while he expressed his desire to speak with counsel, he never showed a reluctance to speak without an attorney present.  *Id.* at 603.

The Court of Appeal found analogous Smith's scenario to the point where he clearly invoked his wish to call counsel, finding that "defendant ruminated about contacting counsel, and detectives reiterated he was free to leave and not under arrest.  Defendant willingly continued the interview, showing no reluctance to talk to detectives." (Lodged Doc. No. 3, at 26).  This evidenced a desire to speak to an attorney in the future, but not hesitation to continue an interview without the presence of counsel.  Furthermore, after questioning ceased, Smith reinitiated contact with the officers.  They then re-administered his rights, and he agreed that he wished to waive his right to counsel.  (Lodged Doc. No. 3, at 26).  The Court of Appeal found as a fact that "defendant renewed contact with the detective, knowingly waived his right to counsel, and confessed." (Lodged Doc. No. 3, at 26).

Third, the court considered whether the officers coerced Smith's statement by promising leniency for his wife as an accessory.  It stated that the officers warned Smith that his and his wife's statements conflicted, and Smith should tell the truth so as to not implicate his wife.  It said that Smith brought up the idea of leniency, not the detectives, and he "set the conditions, not

1  the detectives." (Lodged Doc. No. 3, at 28).  The court determined that this was not coercive

2  behavior by the officers under California law. (Lodged Doc. No. 3, at 28 (citing *People v.*

3  *Jackson*, 96 Cal. Rptr. 414 (Cal. Ct. App. 1971)).

4        Finally, Smith argued that his *Miranda* admonitions were inadequate because the officers

5  told him he had the right to have an attorney "present during questioning." (Lodged Doc. 3, at

6  28).  This, he claimed, was different from being told he had the right to "consult" an attorney.

7  The court found that Smith knew that "he was entitled to consult with and seek the advice of an

8  attorney.  [He] was not under the impression he had only the right to the physical presence of an

9  attorney." (Lodged Doc. No. 3, at 28).

10       *D.  Analysis*

11       Before this Court, Smith reiterates his arguments that (1) the police employed an

12  impermissible deliberate two-step interrogation tactic, and (2) his confession was the result of

13  police coercion.

14              *1. Two-step interrogation tactic*

15       A two-step interrogation process is one where "a confession [is] obtained after a *Miranda*

16  warning but preceded [sic] by the suspect's earlier, unwarned incriminating statements." *United*

17  *States v. Williams*, 435 F.3d 1148, 1152 (9th Cir. 2006) (emphasis removed).  It is impermissible

18  to employ this technique if the midstream *Miranda* warnings do not effectively apprise the

19  defendant of his constitutional rights.  *Id.* at 1157-58.  The test here is whether (1) the use of this

20  interrogation technique by officers was deliberate, *id.* at 1159, and (2) the midstream *Miranda*

21  warnings "adequately and effectively apprised the suspect that he had a 'genuine choice whether to

22  follow up on [his] earlier admission,'" *id.* at 1160 (quoting *Missouri v. Seibert*, 542 U.S. 600, 615

23  (2004)).

24       The officers' interrogation of Smith cannot be categorized as a two-step interrogation.  He

25  neither divulged incriminating evidence nor made inculpatory admissions prior to the invocation

26  of his rights.  (Lodged Doc. No. 1, at 775).  His confession was not obtained until after he

27  received formal *Miranda* warnings, stated that he understood those warnings, and agreed that he

28  waived the constitutional protection.  (Lodged Doc. No. 1, at 775).  This is not a case like

1   *Oregon v. Elstad*, 470 U.S. 298 (1985), or *Seibert*, where officers withheld the warnings until

2   after the suspect confessed, and then offered them at a "particularly opportune time . . . , after the

3   suspect ha[d] already confessed." 542 U.S. at 611. Unlike the defendants in *Elstad* and *Seibert*,

4   Smith did not make incriminating statements both before and after receiving a *Miranda* warning.

5   All his incriminating statements were given after the officers explained his constitutional rights

6   three times and he freely waived them.

7                    *2. Officers' coercion*

8          Smith argues that the officers coerced his statements by (1) deliberately violating

9   *Miranda*, and (2) exploiting parental instincts and promising leniency for his wife in exchange for

10  a confession. This, he argues, led to an involuntary waiver of his rights prior to his confession.

11         The Fifth Amendment guarantees that "no person . . . shall be compelled in any criminal

12  case to be a witness against himself" and an involuntary statement by a defendant violates the Due

13  Process Clause of the Fifth Amendment. U.S. CONST. AMEND. V; *see also United States v. Miller*,

14  984 F.2d 1028, 1030 (9th Cir. 1993). A confession is involuntary if coerced "either by physical

15  intimidation or psychological pressure." *United States v. Crawford*, 372 F.3d 1048, 1060 (9th

16  Cir. 2004), *cert. denied*, 543 U.S. 1057 (2005). "The test for determining whether a confession is

17  voluntary is 'whether, considering the totality of the circumstances, the government obtained the

18  statement by physical or psychological coercion or by improper inducement so that the suspect's

19  will was overborne.'" *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997) (quoting

20  *Derrick v. Peterson*, 924 F.2d 813, 817 (9th Cir. 1990)). The pivotal question is whether the

21  defendant's will was overborne when he confessed. *Miller*, 984 F.2d at 1031.

22         The California Court of Appeal found that, looking at the totality of the circumstances,

23  Smith's will was not overborne by the officers' interrogation. This determination is not contrary

24  to, or an unreasonable application of, United States Supreme Court precedent.

25         First, Smith claims that his invocation of the right to an attorney went unheeded by the

26  investigating officers. The Supreme Court has declared that courts must "determine whether the

27  accused actually invoked his right to counsel" by way of objective inquiry. *Davis v. United*

28  *States*, 512 U.S. 452, 458-59 (1994). "Invocation of the *Miranda* right to counsel 'requires, at a

minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Id.* at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). However, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* The request must be unambiguous and clear such "that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* "If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect." *Id.*; *see also Moran v. Burbine*, 475 U.S. 412, 433, n.4 (1986) ("[T]he interrogation must cease until an attorney is present *only* [i]f the individual states that he wants an attorney.").

Smith's references to an attorney did not rise to the level of an unambiguous and clear request for counsel. After each reference to an attorney, Smith acknowledged that he was not under arrest and agreed with officers that it was best for him to stay and speak with them to establish his innocence. (Lodged Doc. No. 1, at 716, 734-35, 737-38). These ambiguous references asking the officers for advice on whether he needed a lawyer "[did] not require the cessation of questioning." *Davis*, 512 U.S. at 459. It was only when the officers told him he was under arrest and requested a DNA swab that Smith affirmatively and unequivocally stated that he wanted a lawyer. (Lodged Doc. No. 1, at 754-55). However, after the hour-long break, when he himself reinitiated conversation with the officers, he chose to waive the right he had previously invoked. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). He expressly waived that right when officers re-administered his *Miranda* warnings, and he acknowledged that he understood his constitutional rights and sought to speak with them without an attorney present. (Lodged Doc. No. 1, at 775-77). It was only after this waiver that Smith then confessed to murdering LaTrenda Mangram and covering up the crime by burying her body in shallow grave and destroying physical evidence.

Second, Smith argues that the officers coerced him into an involuntary confession by promising leniency to his wife, Felicia. Express or implied promises of leniency can be evidence

1   of involuntariness. *Cf. Brady v. United States*, 397 U.S. 742, 750 (1970) (noting that direct or

2   indirect promises of a benefit in plea bargaining can indicate that the plea was coerced).

3   However, such implied promises of leniency, when considered against the totality of the

4   circumstances, must still overbear the will of the suspect in order to render the confession

5   involuntary. *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).  As the California Superior

6   Court and the Court of Appeal found, it was Smith who first requested leniency for his wife upon

7   reinitiating his contact with officers.  (Lodged Doc. No. 1, 778-79).  This shows that his

8   confession was still within the realm "governing self-direction," and was "the product of an

9   essentially free and unconstrained choice by its maker." *Culombe*, 367 U.S. at 602.

10      Smith has offered no evidence–let alone clear and convincing evidence as required by 28

11   U.S.C. § 2254(e)(1)–to rebut the factual finding by the California state courts that he "was at all

12   times cognizant of his right and ability to have a lawyer present and chose not to do that."

13   (Lodged Doc. No. 3, at 11-12).  With regard to the voluntariness of Smith's confession, the

14   California courts did not decide this issue in a manner that was contrary to, or an unreasonable

15   application of, Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  Thus, federal habeas relief is

16   not warranted on this claim.

17   **II.   California Jury Instruction -- Criminal 2.03 and 2.06**

18      Smith claims that the trial court's California jury instructions pursuant to Instructions 2.03

19   and 2.06 unconstitutionally pinpointed particular evidence in the case for an inference of guilt, and

20   that the court impermissibly denied Smith's analogous pinpoint instruction under Instruction 3.32.

21      The trial court supplied both Instructions 2.03 and 2.06 for the jury.  At the time,

22   Instruction 2.03 stated,

> If you find that before this trial the defendant made a willfully false or deliberately
> misleading statement concerning the crime for which he is now being tried, you
> may consider that statement as a circumstance tending to prove a consciousness of
> guilt.  However, that conduct is not sufficient by itself to prove guilt, and its
> weight and significance, if any, are for you to decide.

26   (Lodged Doc. No. 1, at 466; Lodged Doc. No. 3, at 29-30).  Instruction 2.06 permitted the

27   following instruction:

28      If you find the defendant attempted to suppress evidence against himself in any

manner, such as by destroying evidence or concealing evidence, this [attempt] may be considered by you as a circumstance tending to show consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide.

(Lodged Doc. No. 1, at 467; Lodged Doc. No. 3, at 30).  Both of these instructions were presented to the jury over Smith's objection.

The trial court refused Smith's request for a modification of Instruction 3.32, which would have instructed the jury that it could consider expert witness testimony regarding depressive disorder.  The court permitted Instruction 3.32 in its unmodified form: "You have received evidence regarding a mental disease, defect or disorder of the defendant at the time of the commission of the crime . . . . You should consider this evidence solely for the purpose of determining whether the defendant actually formed the required specific intent . . . ."  (Lodged Doc. No. 3, at 31).  It also presented Instructions 2.80 and 2.82, which informed the jury that experts could present opinions and that the jury could weigh those opinions as it saw fit. (Lodged Doc. No. 1, at 482, 484; Lodged Doc. No. 3, at 31).

Smith argues that including Instruction 3.32 would have permitted the jury to consider his expert's testimony on whether his depressive disorder prohibited him from forming the specific intent to kill Mangram.  The California Court of Appeal rejected Smith's claims regarding Instructions 2.03 and 2.06 because the California Supreme Court had rejected an identical argument in *People v. Kelly*, 822 P.2d 385, 1 Cal. 4th 495, 531-32 (Cal. 1992). (Lodged Doc. No. 1, at 30).  With regard to Instruction 3.32, the Court of Appeal stated that

> Upon request, a trial court must give jury instructions that pinpoint the theory of the defense, but the court can refuse instructions that highlight specific evidence as such. Because the latter type of instruction invites the jury to draw inferences favorable to one of the parties from specified items of evidence, it is considered argumentative and therefore should not be given.

(Lodged Doc. No. 3, at 30-31).  It found that the trial court did not err by prohibiting the modification because though Smith's expert, Wicks, testified that Smith's chronic back pain and long-term prescription drug use could lead to depression, Wicks's evaluation was made after Mangram's death and without any indication of what Smith's mental state was prior to or on the day of Mangram's murder.  (Lodged Doc. No. 3, at 31-32).  Furthermore, Wicks's analysis was

-16-

based on an estimation of the amount of drugs he believed Smith to be taking.  Wicks also acknowledged that Smith could still plan and carry out a murder while taking the medications. (Lodged Doc. No. 3, at 32).

     A.     *California Jury Instruction -- Criminal 2.03 and 2.06*

     In his federal habeas petition, Smith argues that, while the instructions are permissible under California law, they violate the United States Constitution because they direct the jury's attention to particular pieces of evidence which could demonstrate the defendant's consciousness of guilt.  He claims that these jury instructions pinpointed his confession and the evidence related to it.

     A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in a federal habeas corpus action.  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) ("[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief.").  To obtain a federal writ of habeas corpus for errors in the jury charge, a petitioner must show that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Id.* at 72 (quotation marks and citation omitted).  "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

     The Ninth Circuit has previously held that Instruction 2.03 is constitutional.  *Turner v. Marshall*, 63 F.3d 807, 819–20 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999).  In *Turner*, the court held that "[s]o long as the instruction does not state that inconsistent statements constitute evidence of guilt, but merely states that the jury may consider them as indicating a consciousness of guilt, the instruction would not violate constitutional rights."  *Id.* at 820.  In this case, the jury was instructed that *if* they found that Smith had made willfully false or deliberately misleading statements before trial they *could*, but

1    were not required to, consider that as evidence tending to show a consciousness of guilt.  This

2    does not improperly relieve the State of its burden of proof or require the jury to infer guilt or

3    even consciousness of guilt.  *See Francis v. Franklin*, 471 U.S. 307, 314-15 (1985) (holding that

4    a permissive inference in a jury instruction is not a violation of due process).  The same is true of

5    Instruction 2.06, which essentially mirrors Instruction 2.03 regarding consciousness of guilt.

6        Based on the foregoing, this Court holds that the California Court of Appeal's rejection

7    of Smith's instructional error claim as to Instructions 2.03 and 2.06 was neither contrary to, nor

8    an unreasonable application of, clearly established federal law as determined by the United States

9    Supreme Court.  *See* 28 U.S.C. § 2254(d).  Thus, federal habeas relief is not warranted on this

10   claim.

11       *B.      California Jury Instruction -- Criminal 3.32*

12       Smith also argues that the trial court erred by not giving Instruction 3.32, as modified,

13   when it chose to allow Instructions 2.03 and 2.06.  He insists that Instructions 2.03 and 2.06

14   supported the prosecution's theory of the case, and he should have been permitted to present to

15   the jury an instruction based on his own theory.  "As a general proposition, a defendant is

16   entitled to an instruction as to any recognized defense for which there exists evidence sufficient

17   for a reasonable jury to find in his favor."  *Mathews v. United States*, 485 U.S. 58, 63 (1988).  A

18   violation of the defendant's right to due process occurs when the failure to give an instruction

19   precludes the jury from considering a viable theory of defense.  *Bashor v. Risley*, 730 F.2d 1228,

20   1240 (9th Cir. 1984).  Courts again look to whether the missing instruction "so infected the

21   entire trial that the resulting conviction violates due process."  *Estelle*, 502 U.S. at 72.  "An

22   omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the

23   law."  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  Therefore, "[i]n this case, the

24   [petitioner]'s burden is especially heavy because no erroneous instruction was given."  *Id.*

25       Here, Smith was able to present his theory that a depressive disorder prevented him from

26   committing a premeditated and deliberate murder.  The jury heard testimony from expert

27   witnesses regarding Smith's depression.  (Lodged Doc. No. 2, at 483-508).  Smith's counsel

28   argued in closing that Smith's depressive disorder prevented him from forming the specific intent

-18-

required for first degree murder.  (Lodged Doc. No. 2, at 622-23).  Counsel said that Smith's "mind was not the same from prescription drug use and chronic pain."  (Lodged Doc. No. 2, at 622).  He continued:

> [I]n this case, the chronic pain alone, combined . . . with his prescription abuse disorder, caused depression disorder.  Yes, you can plan and do things when you're depressed or suffering from chronic pain or substance abuser withdrawing, but you don't do them with the same deliberate quality in the legal sense of the word.

(Lodged Doc. No. 2, at 623).

Smith was not denied his defense that a depressive disorder impacted his decision-making ability, hindering his capability to premeditate or deliberate.  He has not met his burden by showing that the jury was unable to consider his viable defense, or that the absence of the instruction rendered the trial fundamentally unfair.  Therefore, this Court holds that the California Court of Appeal's determination was neither contrary to, nor an unreasonable application of, Supreme Court precedent.  28 U.S.C. § 2254(d)(1).  He is not entitled to habeas relief on this claim.

### III.   Lying-in-Wait Special Circumstance

Smith's final claim is that the trial court's use of Instruction 8.25 on lying in wait was unconstitutional both on its face and as applied because it failed to instruct the jury on elements of the offense and impermissibly reduced the government's burden of proof.  He argues that the instruction (1) lessens the government's burden of proof because it requires that the jury find either premeditation *or* deliberation, and (2) fails to specify any durational component for premeditation.  Instruction 8.25 as given at trial states:

> Murder which is immediately preceded by lying in wait is murder of the first degree.
> The term "lying in wait" is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or by some other secret design to take the other person by surprise even though the victim is aware of the murderer's presence.  The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation as defined in the prior instruction.
> The word "premeditation" means considered beforehand.
> The word "deliberation" means formed or arrived at or determined up as a result of careful thought and weighing of considerations for or against the proposed course of action.

(Lodged Doc. No. 1, at 496).

-19-

The California Court of Appeal rejected Smith's arguments that Instruction 8.25 is unconstitutional:

> [C]ourts have also rejected defendant's argument that the lying in wait special circumstance is unconstitutionally vague because it provides insufficient notice of what conduct is prohibited. (*People v. Edwards* (1991) 54 Cal.3d 787, 824; *People v. Superior Court* (*Bradway*) (2003) 105 Cal.App.4th 297, 310-311.)  In light of this authority, we find no merit in defendant's constitutional challenges to the lying in wait special circumstance allegation.

(Lodged Doc. No. 3, at 33).

Smith's first argument is that, by the instruction's use of disjunctive, the jury was able to convict him without finding both premeditation and deliberation as required for first-degree murder.  However, when considered alongside the other instructions provided to the jury, a reasonable juror would have concluded that she must find both premeditation and deliberation. Instruction 4.21 stated that, "In the crime of first degree murder of which the defendant is accused in Count One, necessary elements are the existence in the mind of the defendant of malice aforethought, a specific intent to kill, premeditation, *and* deliberation." (Lodged Doc. No. 1, at 489) (emphasis added).  Instruction 8.20 stated that, "All murder which is perpetrated by any kind of willful, deliberate *and* premeditated killing with express malice aforethought is murder of the first degree." (Lodged Doc. No. 1, at 494) (emphasis added).  Instruction 8.20 also contains the following language:

> If you find that the killing was preceded and accomplished by clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation *and* premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree.

(Lodged Doc. No. 1, at 494) (emphasis added).  Finally, the trial court instructed that, "In the special circumstance of intentional murder by means of lying in wait a necessary element is the existence in the mind of the defendant of a specific intent to kill and the mental state of premeditation *and* deliberation." (Lodged Doc. No. 1, at 511) (emphasis added).

Smith's second argument is that his right to due process was violated because the Instruction fails to specify a durational component.  He believes that "[s]ince the facts of this case did not provide support for the finding that Smith observed Mangram for any period of

time, the instruction permitted the jury to find Smith guilty without proof that he watched and waited for any length of time." He claims that the jury should have been instructed that there needed to be a "substantial period of watching and waiting" in order to find this special circumstance. However, the California Supreme Court has said that "[t]he true test is not the duration of time as much as it is the extent of reflection. Thoughts may follow each other with great rapidity and cold, calculated judgement may be arrived at quickly." *People v. Cole*, 95 P.3d 811, 857 (Cal. 2004).

In *Edwards v. Ayers*, 542 F.3d 759, 767 (9th Cir. 2008), the Ninth Circuit considered whether the rights of a petitioner–who was convicted of first-degree murder and sentenced to death–were violated because the lying-in-wait special circumstance instructed at the guilt phase did not require a "'substantial period' of waiting and watching." The court found the instruction did not violate Edwards's constitutional rights, stating: "Edwards' jury was instructed . . . that the period of waiting and watching had to be of sufficient duration to prove beyond a reasonable doubt the elements of waiting, watching, and concealment, and that the defendant intended to kill the victim during the period of lying in wait." *Id.* It agreed with the California Supreme Court that " these requirements necessarily conveyed a 'substantial temporal element.'" *Id.*

Smith's jury received an analogous instruction requiring that the jury find each of the elements of the special circumstance–including that the duration of time be sufficient to "show a state of mind equivalent to premeditation or deliberation–beyond a reasonable doubt. (Lodged Doc. No. 1, at 510). The California Court of Appeal's determination regarding the constitutionality of the lying-in-wait special circumstance was neither contrary to, nor an unreasonable application of, established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). Thus, federal habeas relief is not warranted on this claim.

Therefore, it is hereby

ORDERED that Smith's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED. The case is DISMISSED with prejudice.

The Clerk is directed to enter the accompanying Judgment and to send uncertified copies of this Order and the Judgment to all counsel of record and to any party appearing pro se at said

1  party's last known address.

2       DATED this 25th day of November, 2009.

3

4                         /s/ Richard C. Tallman

                        UNITED STATES CIRCUIT JUDGE

5                          Sitting by designation

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28